UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X

VIVIAN L. OQUENDO,

                              *Plaintiff*,                    **Case No.**

     -against-                                               **COMPLAINT**

MERRICK B. GARLAND, ATTORNEY                                 <u>**JURY TRIAL DEMAND**</u>
GENERAL, U.S. DEPARTMENT OF JUSTICE,

                              *Defendant*.
-------------------------------------------------------------X

      1.     Plaintiff, Vivian L. Oquendo ("Plaintiff), by and through her attorneys, Ballon Stoll

P.C., brings this action against Merrick B. Garland, Attorney General of the United States, U.S.

Department of Justice ("Defendant"), for unlawful discrimination arising out of her employment

with the U.S. Drug Enforcement Administration ("DEA" or "Agency"), treatment which consisted

of continuing acts of harassment and discrimination on the basis of Plaintiff's sex and national

origin, and in retaliation for her protected EEO activity, in violation of Title VII of the Civil Rights

Act of 1964, 42 U.S.C. § 2000e *et seq.*, as amended ("Title VII").

**JURISDICTION AND VENUE**

      2.     The Court has jurisdiction over this action pursuant to 42 U.S.C. §§ 2000e–5(f),

2000e–16(c), and 12117(a), and 28 U.S.C. § 1331.

      3.     This Court may assert jurisdiction over Defendant Merrick B. Garland as head of

the Agency.

      4.     Venue in this Court is appropriate under 28 U.S.C. § 1391 because "a substantial

part of the events or omissions giving rise to the claim occurred" within this jurisdiction.

**PARTIES**

5.     Plaintiff, a citizen of the United States, resident of Lima, Peru, and former resident of New York, NY during the events that are the subject of this action, is an employee at the DEA, where she serves as a Supervisory Criminal Investigator and Supervisory Special Agent ("SSA").

6.     Defendant Merrick B. Garland is the Attorney General of the United States, and as such, is head of the Agency. He is being sued in his official capacity. The Agency is an employer that employees approximately 10,000 people globally.

**JURY DEMAND**

7.     Plaintiff hereby demands a trial by jury in this action.

**FACTS**

8.     Plaintiff is a female of Hispanic/Latino descent.

9.     Plaintiff is a Supervisory Criminal Investigator (GS-1811-14) and Supervisory Special Agent ("SSA") at the Agency.

10.     Plaintiff has been employed at the Agency since March 2005, when she was hired as Criminal Investigator/Special Agent ("SA") (GS-13).

11.     Plaintiff received Outstanding annual performance ratings for Fiscal Year ("FY") 2019, FY2020, FY2021, and FY2022, and received no negative comments in those evaluations.

12.     In or around October 2018, Plaintiff was promoted to Supervisory Criminal Investigator/Supervisor Special Agent ("SSA") (GS-14).

13.     In February 2019, Plaintiff was a Group Supervisor ("GS") at the Agency's New York Division ("NYD") in New York, NY, overseeing Enforcement Group D-35 ("D-35"), a position she held since October 2018.

14.     In February 2019, Plaintiff's first-line supervisor was Assistant Special Agent in Charge ("ASAC") Carl Beckett, and her second-line supervisor was Associate Special Agent in Charge ("A/SAC") Keith Kruskall.

15.     In February 2019, Raymond P. Donovan was serving as the NYD's Special Agent in Charge ("SAC"). SAC Donovan became Plaintiff's second-line supervisor in June 2019.

16.     On or around February 2019, Plaintiff learned that SAC Donovan directed A/SAC Kruskall to instruct ASAC Beckett to reprimand Plaintiff, but ASAC Beckett refused to do so because he did not think Plaintiff had done anything wrong. SAC Donovan and A/SAC Kruskall later testified that Plaintiff needed counseling because some of her staff in D-35 allegedly complained about Plaintiff's leadership style. However, neither SAC Donovan nor A/SAC Kruskall, nor any other Agency employees, ever presented any criticisms of Plaintiff beyond statements that were vague, entirely subjective, and wholly lacking in documentary support. SAC Donovan also testified that Plaintiff was a great manager who fully performed her supervisory duties.

17.     On or about May 22, 2019, SAC Donovan assigned SA Kenneth Wasley, a white male, as a backup GS to Plaintiff in D-35 and gave him vague "marching orders" to step in for Plaintiff whenever he deemed it necessary, a management action that was unprecedented, not discussed with Plaintiff, HR, upper management, or ASAC Beckett, and was extremely disruptive as it led to confusion and chaos in D-35. Less than two months later, SAC Donovan removed SA Wasley from the backup role and restored Plaintiff as sole GS of D-35.

18.     On or about May 22, 2019, Task Force Officers ("TFOs") Frank Aresta and Alex Colon were reassigned from D-35 to NYD Enforcement Groups D-34 and D-32, respectively.

19.     Beginning in or around June 2019, SAC Donovan deliberately avoided Complainant and did not visit with her as he did with the other 25-30 GSs in the NYD, including GS Caesar Medina. SAC Donovan later testified that he almost never met with Plaintiff or spoke with her.

20.     In June 2019, SAC Donovan reassigned Plaintiff to the position of GS of NYD's Technical Operations Group S-31 ("S-31") within the NYD's Title III Operations Center. SAC Donovan and A/SAC Kruskall later testified that Plaintiff was reassigned because some of Plaintiff's staff in D-35 allegedly complained about her leadership style. However, neither SAC Donovan nor A/SAC Kruskall, nor any other Agency employees, ever presented any criticisms of Plaintiff beyond statements that were vague, entirely subjective, and wholly lacking in documentary support. SAC Donovan also testified that Plaintiff was a great manager who fully performed her supervisory duties.

21.     In January 2020, Harry Giknavorian was promoted to A/SAC at the NYD and became Plaintiff's first-line supervisor.

22.     Beginning in or around January 2020, Agency management opposed and interfered with Plaintiff's efforts to manage compliance irregularities among her staff and hold them accountable for deficiencies in performance and conduct.

23.     Beginning in or around January 2020, Agency management prohibited Plaintiff from sending any division-wide emails to all enforcement personnel in the NYD, even while other Special Agents ("SAs") and SSAs were allowed to do so. SAC Donovan and A/SAC Giknavorian later testified that there was allegedly a NYD policy requiring SAs and SSAs to obtain approval from a SAC or A/SAC to send out division-wide emails, but they could not explain why Plaintiff was denied approval for such emails while other SSAs and even SAs were granted approval.

24.     On May 14, 2020, during a meeting between A/SAC Giknavorian and Plaintiff, A/SAC Giknavorian made offensive, demeaning statements to Plaintiff, including sexist comments such as telling her to bake cookies for her staff, telling her to go to church and find inner peace, and falsely claiming that the alleged problems she was having with one of her staff, Investigative Specialist ("IS") Jimmy Alvarado, might be due to a messy breakup following a romantic relationship with him (which never existed). Plaintiff immediately told A/SAC Giknavorian that she was offended by his comments and false allegations.

25.     A/SAC Giknavorian later testified that he had never been trained to tell a subordinate to bake cookies or go to church, and that he had never told a subordinate other than Plaintiff to bake cookies, go to church, or that interpersonal problems might be because of a failed romantic relationship.

26.     Plaintiff first contacted the Agency's Equal Employment Opportunity ("EEO") Office on May 21, 2020 to report harassment and discrimination based on her sex (female). Plaintiff continued to communicate regularly with Agency EEO counselors by phone, text message, and email from September 2020 to March 2021 to elaborate on her allegations of discrimination and report additional allegations.

27.     On May 27, 2020, Plaintiff was selected for a Permanent Change of Station ("PCS") assignment as the Resident Agent in Charge ("RAC") of the Agency's Office in São Paolo, Brazil, with a reporting date of September 2021.

28.     On or about June 17, 2020, A/SAC Giknavorian subjected Plaintiff to irate questioning about how she was supervising her staff.

29.     On August, 28, 2020, A/SAC Giknavorian informed Plaintiff that he and SAC Donovan were going to reassign her to the NYD's Special Projects Unit ("Special Projects") in the

Office of Recruitment and Human Resources ("Recruitment and HR"). Plaintiff told A/SAC Giknavorian and SAC Donovan that she strongly objected to the reassignment plan, asked them if she was being punished, and expressed a deep fear of humiliation. A/SAC Giknavorian and SAC Donovan claimed that Plaintiff was not being punished, and that she would be doing them a favor. They further told her that they wanted her to use her skills to fix Recruitment and HR. However, Plaintiff's skills were in supervising employees and running a tight, accountable ship to ensure the organization and safety of operations, not in HR and Recruitment.

30.     A/SAC Giknavorian and SAC Donovan later testified that they reassigned Plaintiff to Special Projects because of alleged complaints and criticisms from Plaintiff's staff in S-31 about her leadership style. However, A/SAC Giknavorian and SAC Donovan also testified that IS Alvarado was the only member of S-31 who allegedly complained about her.

31.     IS Alvarado demonstrated serious problems with following instructions, respecting authority (particularly women), and being held accountable in the areas for which Plaintiff was responsible as his supervisor, including excessive overtime, excessive holiday work, and noncompliance with policies for Official Government Vehicles ("OGVs").

32.     SAC Donovan later testified that IS Alvarado was extremely busy, overextended, and inadequately supported by the Agency.

33.     The issue of Investigative Specialists (391s) being allowed to claim unlimited overtime, which Plaintiff was monitoring and raising concerns about, has been or is being addressed by the Agency.

34.     A/SAC Giknavorian was aware of Plaintiff's complaints about IS Alvarado. For example, A/SAC Giknavorian testified that he had spoken with IS Alvarado about doing his part, following rules, and doing what he needed to do.

35.     SAC Donovan testified that A/SAC Giknavorian told him about Plaintiff's complaints about IS Alvarado.

36.     A/SAC Giknavorian and SAC Donovan also testified that Plaintiff was a great manager who fully performed her supervisory duties. They also testified that she was responsible for a wide range of monitoring, compliance, and safety issues, and that many actions she took as a manager demonstrated sound leadership and furthered winning the hearts and minds of her staff.

37.     Neither A/SAC Giknavorian nor SAC Donovan, nor any other Agency employees, ever presented any criticisms of Plaintiff beyond statements that were vague, entirely subjective, and wholly lacking in documentary support.

38.     Plaintiff's position in Special Projects was a position in name only that drastically altered her terms and conditions of employment: (1) Agency management failed to develop, implement, and communicate to anyone an adequate plan for Plaintiff's integration into Special Projects: (2) Agency management failed to devise and communicate to anyone the position's title, duration, purpose, duties, responsibilities, performance objectives, and reporting structure; (3) Agency management failed to properly prepare an office, workspace, and information technology resources for Plaintiff; (4) the staff in Special Projects, and Recruitment and HR, did not know what Plaintiff's role was in Special Projects was or why she was placed there; (5) the staff in Special Projects, and Recruitment and HR, could not identify any issues or projects on which they needed assistance from Plaintiff; and (6) unlike her previous roles as GS of S-31 and GS of D-35, the role in Special Projects did not involve any supervisory or investigative duties.

39.     On September 3, 2020, SAC Donavan issued a memo to the entire NYD entitled "Reassignment of Personnel - New York Division (NYD)." The memo listed Plaintiff's new assignment in Special Projects, with an effective date of September 13, 2020. The memo also listed

the reassignment of SA Jessica Clifford, a white woman, to the role of Acting GS of S-31, with an effective date of September 13, 2020.

40.     On or about September 3, 2020, A/SAC Giknavorian instructed Plaintiff to move her workstation from the NYD's eighth floor, where the Title III Operations Center was located, to the fifth floor, where Recruitment and HR were located. Plaintiff told A/SAC Giknavorian that she strongly objected to having to move her office and expressed fear of humiliation.

41.     Beginning on or about September 18, 2020, Plaintiff learned that Agency management: (1) removed Plaintiff from S-31's staff roster; (2) removed her from S-31's email alert notifications; (3) removed her supervisory authority and duties concerning S-31 staff timesheets and related time and attendance matters; and (4) removed her supervisory authority and duties concerning S-31 staff FY20 performance appraisals and FY21 performance work plans ("PWPs") even though she had been the first-line supervisor of record during almost the entire relevant period.

42.     On September 22, 2020, SAC Donovan issued a second memo to the entire NYD entitled "Reassignment of Personnel - New York Division (NYD) (Revised)." The memo revised the effective date of SA Clifford's reassignment to Acting GS for S-31 to September 27, 2020.

43.     In preparation for her PCS assignment in São Paolo, Plaintiff was required to attend 600 hours of Portuguese language instruction offsite in New York City beginning September 28, 2020 and completing on or before April 23, 2021. The training's daily requirements consisted of six hours of classroom instruction with a two-hour self-study period on-site. During her time in language training, Plaintiff was not expected to be physically present in NYD's offices.

44.     On or about September 30, A/SAC Giknavorian retired from the Agency.

45. On October 1, 2020, A/SAC Frank Del Re became Plaintiff's new first-line supervisor, replacing the retired A/SAC Giknavorian.

46. A/SAC Del Re testified that Plaintiff was responsible for a wide range of monitoring, compliance, and safety issues, and that many actions she took as a manager demonstrated sound leadership and furthered winning the hearts and minds of her staff.

47. On or about October 4, 2020, Plaintiff learned that she had been reassigned to Special Projects effective September 13, 2020.

48. On or about October 28, 2020, Agency management removed Plaintiff from the NYD supervisor email distribution list concerning due dates for FY20 performance appraisals and FY21 PWPs.

49. On November 5, 2020, Plaintiff submitted FY21 PWPs for S-31 to A/SAC Del Re.

50. On December 22, 2020, Plaintiff learned from A/SAC Del Re that because SA Clifford was Acting GS of S-31, Agency management had decided that SA Clifford would do the FY21 PWPs for S-31, thus removing Plaintiff's supervisory duties regarding her staff's FY21 PWPs.

51. On or about February 12, 2021, Agency management removed Plaintiff's supervisory duties concerning providing comments on SA Clifford's Special Agent Promotion Program ("SAPP") application.

52. On or about February 12, 2021, Plaintiff learned that A/SAC Del Re had taken over her role supervising SA Clifford.

53. Plaintiff completed her required foreign language training on April 13, 2021.

54. On April 27, 2021, Plaintiff met with A/SAC Del Re and ASAC Wesley Fritz. A/SAC Del Re instructed her to move her workstation from the NYD's eighth floor, where the

NYD's Title III Operations Center was located, to the fifth floor, where Recruitment and HR were located.

55.     Following her return to work in or around April 2021, A/SAC Del Re ignored Plaintiff's emails requesting basic information about her role in Special Projects, including concerning its purpose, duties, responsibilities, performance objectives, reporting structure, and workstation location. A/SAC Del Re later testified that he ignored Plaintiff's emails and otherwise refused to communicate with her because she had filed an EEO complaint.

56.     SAC Donovan later testified that the original plan was to have Plaintiff return to S-31 after foreign language training, but that he later changed his mind and decided the move should be permanent, a decision that was never communicated to Plaintiff.

57.     In or around June 2021, Plaintiff learned that in April 2021, the Agency had reassigned her from Special Projects back to S-31. However, Agency management refused to allow Plaintiff to resume any role in S-31, much less her role of GS of S-31, and instead insisted that she remain in Special Projects for the remaining six months in the NYD prior to commencing her PCS assignment in São Paulo in September 2021.

58.     Beginning in or around June 2021, A/SAC Del Re ignored Plaintiff's emails requesting basic information about how the reassignment back to S-31 affected her role, duties, responsibilities, performance objectives, reporting structure, and workstation location. A/SAC Del Re later testified that he ignored Plaintiff's emails and otherwise refused to communicate with her because she had filed an EEO complaint.

59.     According to ASAC Beckett, the actions of SAC Donovan and ASAC Giknavorian were based on Plaintiff's sex. He also stated they retaliated against her for filing an EEO complaint. He further stated that she was the only minority female GS-14 in the NYD and the only one who

was going through any kind of difficulties with SAC Donovan. He stated Plaintiff's experience in the NYD was one of the worst he had seen in his 23 years in DEA. He maintained he observed nothing she did was outside of DEA's rules, manual, or policy.

60.     According to GS Medina, Plaintiff was subjected to disparate treatment, harassment, disparagement, and hostile work environment. He stated that management sided with IS Alvarado over her. He also stated that other coworkers agreed that Plaintiff was given disparate treatment. He stated that A/SAC Giknavorian could be "crass" in his comments. He further stated that Plaintiff's involuntary reassignment to Special Projects may have been due to IS Alvarado not respecting her authority. He also stated that IS Alvarado had issues with other female colleagues in Plaintiff's area of responsibility, and that Plaintiff did her best to work with the irate IS Alvarado and kept it professional despite his lack of respect for women.

61.     On March 8, 2021, Plaintiff received a Notice of Right to File a Formal EEO Complaint.

62.     On March 23, 2021, Plaintiff filed her Formal EEO Complaint. Her allegations of discrimination consisted of the following:

> From on or about February 2019 until the present, the DEA—through Special Agent in Charge (SAC) Raymond P. Donovan, Associate SAC Harry Giknavorian, and Associate SAC Frank Del Re—has subjected Group Supervisor (GS) Oquendo to a continuing pattern of harassment/hostile work environment and discrimination (disparate treatment, and terms and conditions of employment) on the basis of her sex (female) and in reprisal for her current EEO activity (contacting the Headquarters EEO Office on or about May 21, 2020) by:
>
> a.     On or about February 2019, GS Oquendo learned that SAC Donovan had requested earlier that month that her then immediate supervisor, Assistant Special Agent in Charge (ASAC) Carl Beckett, reprimand her, but SAC Donovan did not give ASAC Beckett a reason for the requested reprimand.
>
> b.     On or about May 22, 2019, SAC Donovan assigned a Senior GS-13, SA Kenneth Wasley, to be GS Oquendo's backup without discussing it with her or ASAC Carl Beckett, her immediate supervisor at the time, and gave SA Wasley the

go-ahead to undermine GS Oquendo's authority by meeting with her team without her; communicating directly with SAC Donovan, ASAC Beckett, and then Associate SAC Keith Kruskall; and requesting SAC Donovan to give him access to WebTA to be able to certify timesheets.

c.      Beginning on or about January or February 2020, when Associate SAC Giknavorian became GS Oquendo's new supervisor, SAC Donovan and Associate SAC Giknavorian interfered in GS Oquendo's ability to carry out her duties and responsibilities by prohibiting her from sending any emails directly to NYD that concerned her management of her staff, and instead required all such communications to be transmitted through Associate SAC Giknavorian.

d.      On or about May 14, 2020, during a meeting between Associate SAC Giknavorian and GS Oquendo, Associate SAC Giknavorian reprimanded, intimidated, belittled, and disparaged her by: (1) telling her he knew of alleged past troubles with her last group; (2) telling her to "take two steps back" from her supervisory role and let things go because the group was a well-run machine that could run by itself; (3) telling her that SAC Donovan did not like what he was hearing about her and advised that she needed to make her group work; (4) asking her whether she was too focused on her staff's overtime; (5) telling her that she should go to church and find inner peace and search deep inside for a way to work things out; (6) telling her that maybe she and her subordinate who was giving her trouble had dated and that it had not worked out; and (7) telling her to bake cookies after she told him she was insulted by his comments.

e.      Beginning on or about May 14, 2020, SAC Donovan and Associate SAC Giknavorian interfered with GS Oquendo's ability to carry out her duties and responsibilities to address irregularities with her staff, including: (1) the use of Official Government Vehicles (OGVs); (2) special purpose and leased vehicles; (3) overtime; (4) operational compliance; and (5) security personnel for tech staff during operations.

f.      Beginning on or about May 27, 2020, SAC Donovan and Associate SAC Giknavorian tried to rush GS Oquendo's September 2021 move to São Paulo after she was selected for the Resident Agent in Charge position for São Paulo in late May 2020, including by trying to set up a TDY early in São Paulo.

g.      On or about August 28, 2020, Associate SAC Giknavorian informed GS Oquendo that he and SAC Donovan wanted her to move from the Technical Operations Unit in the Office of the ASAC to the Special Projects Unit in the Office of Recruitment and Human Resources, but that it was not a reassignment and would be a favor to them.

h.      On or about September 3, 2020, Associate SAC Giknavorian instructed GS Oquendo to leave her personal things in her office on the eighth floor but sit on the

fifth floor—even though there was no office for her on the fifth floor—in order to be close to the Agent Recruitment and Human Resources units.

i.      On or about September 18, 2020, GS Oquendo learned that she had been removed as GS for the Technical Operations Group S-31 and removed from the Group S-31 Roster, and replaced by SA Jessica Clifford who was named Acting GS of S-31.

j.      On or about October 4, 2020, GS Oquendo learned that SAC Donovan and Associate SAC Giknavorian had reassigned her effective September 13, 2020 from her role as Supervisory Special Agent (SSA) and Group Supervisor (GS) for Group S-31 in the Technical Operations Unit of the Office of the ASAC and moved her to the Special Projects Unit in the Office of Recruitment and Human Resources.

k.      On or about October 10, 2020, GS Oquendo learned that SAC Donovan and Associate SAC Giknavorian had removed her from Group S-31 on WebTA.

l.      On or about October 28, 2020, GS Oquendo learned that SAC Donovan and Associate SAC Giknavorian had instructed Barbara Haggerty (Special Projects) to remove her from the management email distribution list and remove her supervisory duties regarding her staff's FY20 Performance Appraisals.

m.      On or about December 22, 2020, GS Oquendo learned that Associate SAC Frank Del Re had removed her supervisory duties regarding her staff's FY21 Performance Work Plans and had given them to Acting GS Clifford.

n.      On or about February 12, 2021, GS Oquendo learned that Associate SAC Frank Del Re had taken over her role as SA Clifford's supervisor.

63.      On April 26, 2021, the Agency issued a Partial Acceptance Letter for Plaintiff's Formal EEO Complaint, Agency No. DEA-2021-00325, articulating the accepted claims as follows:

Whether you have been discriminated against based on sex (Female) and reprisal (prior EEO activity) when:

1) From February 2019 to the present, you were subjected to a continuing pattern of disparate treatment, harassment and disparagement when, among other things, your SAC recommended that you be reprimanded; your SAC does not visit you as he does with other Group Supervisors; you were subjected to irate questioning; you were told to go to church; you were told to bake cookies; your supervisory and managerial authority was undermined when you were not consulted on who would serve as your back up supervisor; you were prohibited from contacting personnel

from other law enforcement entities; your efforts to manage irregularities among your staff were stifled; you were relocated to the fifth floor; you were prevented from providing comments on a subordinate's application to take a supervisory exam; and you learned that an Associate SAC had taken over your role supervising a Special Agent that had been working under your command.

2) On or about September 18, 2020, you learned that rather than assign an Acting Group Supervisor while you attend language training, you were removed as Group Supervisor for the Technical Operations Group S-31 and removed from the group roster;

3) On or about October 4, 2020, you learned that effective September 13, 2020, you were reassigned to the Special Projects Unit in the Office of Recruitment and Human Resources;

4) On or about December 22, 2020, you learned that your role with regard to your staff's FY21 Performance Work plans were removed from you.

64.     On May 6, 2021, the Agency issued an Amended Partial Acceptance Letter,

amending its articulation of the accepted claims as follows:

Whether you have been discriminated against based on sex (Female) and reprisal (prior EEO activity) when:

1) From February 2019 to the present, you were subjected to a continuing pattern of disparate treatment, harassment and disparagement when, among other things, your SAC recommended that you be reprimanded; your SAC does not visit you as he does with other Group Supervisors; you were subjected to irate questioning; you were told to go to church; you were told to bake cookies; you were told your difficulties with a subordinate male might be due to dating troubles with him; your supervisory and managerial authority was undermined when you were not consulted on who would serve as your backup; you were prohibited from sending any division-wide emails to all enforcement personnel; your efforts to manage irregularities among your staff were stifled; you were relocated to the fifth floor; you were prevented from providing comments on a subordinate's application to take a supervisory exam; and you learned that an Associate SAC had taken over your role supervising a Special Agent that had been working under your command;

2) On or about September 18, 2020, you learned that rather than assign an Acting Group Supervisor while you attend language training, you were removed as Group Supervisor for the Technical Operations Group S-31 and removed from the group roster;

14

3) On or about October 4, 2020, you learned that effective September 13, 2020, you were reassigned to the Special Projects Unit in the Office of Recruitment and Human Resources; and

4) On or about December 22, 2020, you learned that your role with regard to your staff's FY21 Performance Work plans were removed from you.

65.     In or around late September 2021, Plaintiff reported to São Paulo to begin her new RAC position, which she commenced on September 26, 2021.

66.     In or around late September 2021, SA Clifford moved into Plaintiff's former office in S-31.

67.     On October 13, 2021, Plaintiff filed a Request to Amend her Formal EEO Complaint to add national origin/ethnicity (Hispanic/Latino) as an additional basis of discrimination.

68.     On October 22, 2021, the Agency issued an Amended Acceptance Letter, adding national origin/ethnicity (Hispanic/Latino) as an additional basis of discrimination.

69.     On March 1, 2022, the Agency issued a Notice of Completion of Investigation, along with a Report of Investigation ("ROI").

70.     On March 31, 2022, Plaintiff filed a Request for Hearing with the New York District Office of the Equal Employment Opportunity Commission ("EEOC").

71.     On May 31, 2022, an EEOC Administrative Judge ("AJ") issued an Acknowledgment Order in EEOC No. 520-2022-00235X.

72.     On July 12, 2022, pursuant to the EEOC AJ's June 28, 2022 Post-Conference Order, Plaintiff and the Agency filed a Joint Revised Statement of the Issues, which articulated the issues for adjudication as follows:

Whether Complainant was subjected to harassment/hostile work environment and discrimination based on sex (female), national origin/ethnicity (Hispanic/Latino), and reprisal (prior EEO activity) from February 2019 to the present when:

(1)      In or around February 2019, she learned that Special Agent in Charge (SAC) Raymond P. Donovan recommended that she be reprimanded;

(2)      On or about May 22, 2019, her supervisory and managerial authority was undermined when she was not consulted on who would serve as her backup;

(3)      Beginning in or around June 2019, SAC Donovan did not visit her as he did with other Group Supervisors;

(4)      Beginning in or around January 2020, she was prohibited from sending any division-wide emails to all enforcement personnel;

(5)      Beginning in or around January 2020, her efforts to manage irregularities among her staff were stifled;

(6)      On or about May 14, 2020, Associate SAC (A/SAC) Harry Giknavorian subjected her to sexist comments, including telling her to bake cookies and go to church, and that her difficulties with a subordinate male might be due to dating troubles with him;

(7)      On or about June 17, 2020, A/SAC Giknavorian subjected her to irate questioning about how she was supervising her staff;

(8)      On or about September 3, 2020, she was relocated from the eighth floor to the fifth floor;

(9)      On or about September 18, 2020, she learned that rather than assign an Acting Group Supervisor while she attended language training, she was removed as Group Supervisor for the Technical Operations Group S-31 and removed from the group roster;

(10)      On or about October 4, 2020, she learned that effective September 13, 2020, she was reassigned to the Special Projects Unit in the Office of Recruitment and Human Resources;

(11)      On or about December 22, 2020, she learned that her role with regard to her staff's FY21 Performance Work plans was removed from her.

(12)      On or about February 12, 2021, she was prevented from providing comments on a subordinate's application to take a supervisory exam; and

(13)    On or about February 12, 2021, she learned that A/SAC Frank Del Re had taken over her role supervising a Special Agent working under her command.

73.    From July 12, 2022 to September 16, 2022, Plaintiff and the Agency initiated EEOC discovery by serving each other with written discovery requests.

74.    On August 2, 2022, Plaintiff filed with the EEOC AJ a Consent Motion to Amend Complaint or to Extend Deadlines for Discovery and Dispositive Motions ("Motion to Amend"). In the Motion to Amend, Plaintiff requested that the following allegations of discrimination be added to the claims being adjudicated by the EEOC AJ:

> Whether Complainant was subjected to harassment/hostile work environment and discrimination based on sex (female), national origin/ethnicity (Hispanic/Latino), and reprisal (prior EEO activity) when, on July 21, 2022, she was notified that the Agency would be conducting a management review of her office in São Paulo, Brazil on or about August l, 2022 for an indefinite period of time, and that during the management review, she would be put on temporary duty to the Agency's Office of Investigative Technology in Lorton, Virginia starting on or about July 31, 2022.

75.    On August 4, 2022, the EEOC AJ denied the Motion to Amend and ordered the Agency to commence processing the new claims as a separate EEO complaint. The allegations in the Motion to Amend therefore are not included in the present Complaint.

76.    On November 23, 2022, the assigned EEOC AJ issued a Decision and Order Granting the Agency's Motion for Summary Judgment.

77.    On November 28, 2022, the Complaint Adjudication Office ("CAO") of the Department of Justice ("DOJ") issued a letter inviting Complainant and the Agency to submit their positions as to whether the CAO should fully accept or reject the EEOC AJ's November 23, 2022 Decision and Order.

78.     On December 9, 2022, the Agency submitted a brief written response to the CAO's November 28, 2022 letter urging the DOJ to fully accept the EEOC AJ's November 23, 2022 Decision and Order.

79.     On December 15, 2022, Plaintiff submitted a detailed written response to the CAO's letter of November 28, 2022 requesting that the DOJ reject the EEOC AJ's November 23, 2022 Decision and Order due to its failure to acknowledge myriad genuine issues of material fact, and to credit the substantial evidence in the hearing record and the parties' EEOC discovery responses.

80.     On December 23, 2022, the CAO issued a Final Order accepting the EEOC AJ's Decision and Order in favor of the Agency.

81.     This Complaint timely follows.

## **FIRST CAUSE OF ACTION**
### **Employment Discrimination Based on Sex in Violation of Title VII**

82.     Plaintiff hereby repeats, re-alleges, and incorporates each and every allegation contained in the above paragraphs of this Complaint as though fully set forth in this paragraph of the Complaint.

83.     Plaintiff is employed by Defendant, which is an executive agency of the federal government to which Title VII applies.

84.     Discrimination because of an employee's sex is unlawful under Title VII.

85.     Plaintiff is a member of a protected class based on her sex (female).

86.     Defendant was aware of Plaintiff's sex during the relevant time.

87.     While Plaintiff was employed by Defendant, Defendant made sexist, offensive comments to Plaintiff and took actions that negatively impacted Plaintiff's terms, conditions, and privileges of employment.

88.     Defendant's comments and actions were motivated at least in part by discriminatory animus on the basis of Plaintiff's sex.

89.     Plaintiff was subjected by the above-described comments and actions to unwelcome harassment and disparate treatment based on her sex, treatment that was inferior to her colleagues who were not female.

90.     Defendant's improper treatment of Plaintiff constitutes illegal harassment and disparate treatment on the basis of Plaintiff's sex.

91.     By reason of the continuous nature of Defendants' hostile and discriminatory treatment of Plaintiff, which persisted throughout the relevant periods described above, Plaintiff is entitled to application of the continuing-violations doctrine to all violations alleged herein.

92.     As a direct and proximate result of the harassment and disparate treatment, Plaintiff has suffered pecuniary damages so that she is entitled to a damages award in an amount to be determined at trial.

93.     As a result of Defendant's conduct, Plaintiff has suffered and will continue to suffer nonpecuniary damages including mental anguish, emotional distress, and loss of enjoyment of life.

## SECOND CAUSE OF ACTION

**Employment Discrimination Based on National Origin in Violation of Title VII**

94.     Plaintiff hereby repeats, re-alleges, and incorporates each and every allegation contained in the above paragraphs of this Complaint as though fully set forth in this paragraph of the Complaint.

95.     Plaintiff is employed by Defendant, which is an executive agency of the federal government to which Title VII applies.

96.     Discrimination because of an employee's national origin is unlawful under Title VII.

97.     Plaintiff is a member of a protected class based on her national origin (Hispanic/Latino).

98.     Defendant was aware of Plaintiff's national origin during the relevant time.

99.     While Plaintiff was employed by Defendant, Defendant made offensive comments to Plaintiff and took actions that negatively impacted Plaintiff's terms, conditions, and privileges of employment.

100.     Defendant's comments and actions were motivated at least in part by discriminatory animus on the basis of Plaintiff's national origin.

101.     Plaintiff was subjected by the above-described comments and actions to unwelcome harassment and disparate treatment based on her national origin, treatment that was inferior to her colleagues who were not Hispanic or Latino.

102.     Defendant's improper treatment of Plaintiff constitutes illegal harassment and disparate treatment on the basis of Plaintiff's national origin.

103.    By reason of the continuous nature of Defendants' hostile and discriminatory treatment of Plaintiff, which persisted throughout the relevant periods described above, Plaintiff is entitled to application of the continuing-violations doctrine to all violations alleged herein.

104.    As a direct and proximate result of the harassment and disparate treatment, Plaintiff has suffered pecuniary damages so that she is entitled to a damages award in an amount to be determined at trial.

105.    As a result of Defendant's conduct, Plaintiff has suffered and will continue to suffer nonpecuniary damages including mental anguish, emotional distress, and loss of enjoyment of life.

## THIRD CAUSE OF ACTION

**Employment Discrimination Based on Retaliation for Protected EEO Activity in Violation of Title VII**

106.    Plaintiff hereby repeats, re-alleges, and incorporates each and every allegation contained in the above paragraphs of this Complaint as though fully set forth in this paragraph of the Complaint.

107.    Plaintiff is employed by Defendant, which is an executive agency of the federal government to which Title VII applies.

108.    Discrimination in retaliation for an employee's protected EEO activity is unlawful under Title VII.

109.    Plaintiff engaged in protected EEO activity by reporting and opposing unlawful employment discrimination beginning in May 14, 2020.

110.    Defendant was aware of Plaintiff's protected EEO activity during the relevant time.

111.    Shortly after Plaintiff's protected EEO activity, Defendant subjected Plaintiff to unwelcome harassment and took actions that negatively impacted Plaintiff's terms, conditions, and privileges of employment.

112.    Defendant's actions were motivated at least in part by retaliatory animus on the basis of Plaintiff's protected EEO activity.

113.    Plaintiff was subjected by the above-described actions to unwelcome harassment and disparate treatment based on her protected EEO activity, treatment that was inferior to her colleagues who did not engage in protected EEO activity.

114.    Defendant's improper treatment of Plaintiff constitutes illegal harassment and disparate treatment on the basis of Plaintiff's protected EEO activity.

115.    By reason of the continuous nature of Defendants' hostile, discriminatory, and retaliatory treatment of Plaintiff, which persisted throughout the relevant periods described above, Plaintiff is entitled to application of the continuing-violations doctrine to all violations alleged herein.

116.    As a direct and proximate result of the retaliatory harassment and discrimination, Plaintiff has suffered pecuniary damages so that she is entitled to a damages award in an amount to be determined at trial.

117.    As a result of Defendant's conduct, Plaintiff has suffered and will continue to suffer nonpecuniary damages including mental anguish, emotional distress, and loss of enjoyment of life.

## FOURTH CAUSE OF ACTION

### Hostile Work Environment in Violation of Title VII

118.    Plaintiff hereby repeats, re-alleges, and incorporates each and every allegation contained in the above paragraphs of this Complaint as though fully set forth in this paragraph of the Complaint.

119.    Plaintiff is employed by Defendant, which is an executive agency of the federal government to which Title VII applies.

120.    Creating, or failing to act to protect an employee from, a hostile work environment is unlawful under Title VII.

121.    Plaintiff is a member of protected classes based on her sex (female), national origin (Hispanic/Latino), and protected EEO activity.

122.    Defendant was aware of Plaintiff's sex, national origin, and protected EEO activity during the relevant time.

123.    While Plaintiff was employed by Defendant, Defendant made offensive comments to Plaintiff and took actions that negatively impacted Plaintiff's terms, conditions, and privileges of employment.

124.    Defendant's comments and actions were motivated at least in part by discriminatory animus on the basis of Plaintiff's sex, national origin, and protected EEO activity.

125.    Plaintiff was subjected by the above-described comments and actions to unwelcome harassment and discrimination based on her sex, national origin, and protected EEO activity.

126.    The harassment, discrimination, and retaliation constituted a hostile work environment because it was severe and pervasive enough to affect a term, condition, or privilege of employment, and because a reasonable employee would have found the Defendant's actions

materially adverse such the employee would be dissuaded from engaging in protected EEO activity.

127.    As a direct and proximate result of the hostile work environment, Plaintiff has suffered pecuniary damages so that she is entitled to a damages award in an amount to be determined at trial.

128.    As a result of Defendant's conduct, Plaintiff has suffered and will continue to suffer nonpecuniary damages including mental anguish, emotional distress, and loss of enjoyment of life.

## REQUEST FOR RELIEF

129.    WHEREFORE, Plaintiff respectfully requests that this Court enter Judgment in favor of Plaintiff and against Defendant and award the following relief for the violations alleged above:

     a.   A judgment finding that the Agency engaged in unlawful discrimination against Plaintiff based on her sex, her national origin, and in retaliation for reporting and opposing discrimination;

     b.   Pecuniary damages in an amount to be determined at trial;

     c.   Nonpecuniary damages for severe emotional distress, permanent damage to Plaintiff's emotional and mental wellbeing, loss of enjoyment of life, loss of self-esteem, pain and suffering, and shame and humiliation in the amount of $300,00;

     d.   Pre-judgment and post-judgment interest at the highest lawful rate;

     e.   Attorneys' fees and costs of this action; and

     f.   Any further relief that this Court deems just, proper, and equitable in the circumstances.

Dated:  New York, New York
        March 23, 2023


                                    Respectfully submitted,

                                    BALLON STOLL P.C.

                                    *s/Marshall B. Bellovin*
                                    Marshall B. Bellovin, Esq..
                                    810 Seventh Avenue, Suite 405
                                    New York, NY 10019
                                    Ph: (212) 575-7900 (ext 3270)
                                    Fax: (212) 764-5060
                                    Email: mbellovin@ballonstoll.com
                                    *Attorney for Plaintiff*